# UNITED STATES DISTRICT COURT
## for the
# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>  vs.<br><br>1. Wyatt Joseph Samson<br>   (Counts 1-4),<br><br>2. Loren Dean Bravo, Jr.<br>   (Counts 1-4),<br><br>3. Darren Samson<br>   (Counts 1-4), and<br><br>4. E Jae Dalton Bender<br>   (Counts 1-4),<br><br>            Defendants. | Case No.   MJ-25-04182-PCT-CDB<br><br>**CRIMINAL COMPLAINT** |

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### COUNT 1

From on or about April 20, 2025, and continuing to on or about April 21, 2025, in the District of Arizona, within the confines of the Hualapai Indian Reservation, Indian County, and elsewhere, the defendants WYATT JOSEPH SAMSON, LOREN DEAN BRAVO, JR., DARREN SAMSON, and E JAE DALTON BENDER, Indians, did knowingly and intentionally conspire and agree to commit the following offense against the United States of America:

      CIR-Assault Resulting in Serious Bodily Injury, in violation of Title 18, United States Code, Sections 1153 and 113(a)(6), as alleged in Count 4.

1

Method and Means of the Conspiracy

It was a part of the conspiracy that the conspirators would assault the victim, C.D., by intentionally striking and wounding him, causing him serious bodily injury.

Overt Acts

In furtherance of the conspiracy, and to effect the object of the conspiracy, the conspirators performed or caused to be performed the following overt acts, among others, on or between April 20, 2025, and April 21, 2025:

a. WYATT JOSEPH SAMSON, LOREN DEAN BRAVO, JR., DARREN SAMSON, and E JAE DALTON BENDER followed and stalked C.D. through the streets of the Hualapai Indian Reservation;

b. WYATT JOSEPH SAMSON, LOREN DEAN BRAVO, JR., DARREN SAMSON, and E JAE DALTON BENDER cornered C.D. in the driveway of an abandoned home across the street from the Multi Building;

c. DARREN SAMSON ran up to C.D., struck C.D., and caused C.D. to fall to the ground;

d. WYATT JOSEPH SAMSON used, brandished, and struck C.D. with a dangerous weapon, that is, a hula hoe;

e. WYATT JOSEPH SAMSON, LOREN DEAN BRAVO, JR., DARREN SAMSON, and E JAE DALTON BENDER prevented C.D. getting up and leaving; and

f. One or more of the coconspirators stabbed C.D. with a dangerous weapon, that is, a sharp object like a knife.

In violation of Title 18, United States Code, Sections 371, 1153, and 113(a)(6).

## COUNT 2

On or between April 20, 2025, and April 21, 2025, within the confines of the Hualapai Indian Community, Indian Country, the defendants WYATT JOSEPH SAMSON, LOREN DEAN BRAVO, JR., DARREN SAMSON, and E JAE DALTON

BENDER, Indians, did with malice aforethought, unlawfully kill C.D., and aid and abet the killing.

In violation of Title 18, United States Code, Sections 1153, 1111, and 2.

## COUNT 3

On or between April 20, 2025, and April 21, 2025, within the confines of the Hualapai Indian Community, Indian Country, the defendants WYATT JOSEPH SAMSON, LOREN DEAN BRAVO, JR., DARREN SAMSON, and E JAE DALTON BENDER, Indians, did intentionally and knowingly assault the victim, C.D., with dangerous weapons, that is, with a hula hoe and a sharp object like a knife, with the intent to do bodily harm, and aid and abet the assault.

In violation of Title 18, United States Code, Sections 1153, 113(a)(3), and 2.

## COUNT 4

On or between April 20, 2025, and April 21, 2025, within the confines of the Hualapai Indian Community, Indian Country, the defendants WYATT JOSEPH SAMSON, LOREN DEAN BRAVO, JR., DARREN SAMSON, and E JAE DALTON BENDER, Indians, did intentionally, knowingly, and recklessly assault the victim, C.D., resulting in serious bodily injury, and aid and abet the assault.

In violation of Title 18, United States Code, Sections 1153, 113(a)(6), and 2.

I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this complaint is based on the attached affidavit, incorporated herein.

Continued on the attached sheet and made a part hereof:     ☒Yes     ☐ No

_____
Signature of Complainant

Authorized by: Jennifer E. LaGrange, AUSA

*Digitally signed by JENNIFER LAGRANGE*
*Date: 2025.05.09 10:39:41 -07'00'*

Cameron Mizell, FBI Special Agent
Printed Name and Title of Complainant

Telephonically sworn.

Camille D. Bibles
*Digitally signed by Camille D. Bibles*
*Date: 2025.05.09 12:11:13 -07'00'*

Date: May 9, 2025

Judge's Signature

City and State:   Flagstaff, Arizona

Honorable Camille D. Bibles
United States Magistrate Judge

3

## STATEMENT OF PROBABLE CAUSE

I, Cameron B. Mizell, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. As detailed below, there is probable cause to believe that on or between April 20 and 21, 2025, WYATT JOSEPH SAMSON, LOREN DEAN BRAVO, JR., DARREN SAMSON, and E JAE DALTON BENDER, all Indians, assaulted and killed C.D., an Indian, in Peach Springs, Arizona, on the Hualapai Indian Reservation, in the District of Arizona, in violation of 18 U.S.C. §§ 371, 1153, and 113(a)(6) (Conspiracy to Commit CIR-Assault Resulting in Serious Bodily Injury), 18 U.S.C. §§ 1153, 1111, and 2 (CIR-Second Degree Murder, and Aid and Abet), 18 U.S.C. §§ 1153, 113(a)(3), and 2 (CIR-Assault with a Dangerous Weapon, and Aid and Abet), and 18 U.S.C. §§ 1153, 113(a)(6), and 2 (CIR-Assault Resulting in Serious Bodily Injury, and Aid and Abet).

2. I am an FBI Special Agent and have been since March of 2011. I am currently assigned to the FBI Phoenix Division, Lake Havasu City Resident Agency. I am assigned to investigate crimes occurring on, among other places, the Hualapai Indian Reservation in the District of Arizona. Based on my training, education, and experience, I know that the Hualapai Tribe is a federally recognized tribe. I am an investigative or law enforcement officer of the United States, authorized by law to conduct investigations of, and make arrests for, offenses enumerated in Title 18 of the United States Code.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested complaint and does not set forth all my knowledge about this matter.

## PROBABLE CAUSE

**Initial Scene Response**

4. On April 21, 2025, at approximately 1:30am, I received a call from Hualapai Nation Police Department (Hualapai PD) Criminal Investigator Brenda Ehlert informing

me of a fight involving multiple people that had occurred at approximately 12:11am that morning. The fight reportedly started in front of the home of a person who called emergency services, and continued to the area in front of the Multi Building located at 470 Hualapai Drive, Peach Springs, Arizona, which is just west of the intersection of Hualapai Drive and Diamond Creek Road.

5. Hualapai PD Officer Isaiah Shaw and Hualapai PD Sergeant Christopher Gunnoe were the initial responders. Upon arriving at the Multi Building, Officer Shaw found a male on the south side of Hualapai Drive, in front of the Multi Building, suffering from a stab wound to the chest. The male, later identified as C.D., took his last breath shortly after Officer Shaw arrived. C.D. was found on his back with his head facing east, toward Diamond Creek Road, and his legs facing west.

6. Officer Shaw called for paramedics, and medical support soon arrived. C.D. was moved to an ambulance so that medical personnel could render lifesaving efforts. These efforts were unsuccessful, and C.D. was pronounced dead at 12:49am. Officer Shaw, Sergeant Gunnoe, and other law enforcement personnel established a crime scene perimeter and contacted additional authorities.

7. I arrived on scene at approximately 4:00am. The scene was located on Hualapai Drive, just west of the intersection of Hualapai Drive and Diamond Creek Road. Below is a screenshot from Google Maps of the approximate location where officers found C.D.'s body:



8.      When I arrived, C.D.'s ambulance was parked on Hualapai Drive, approximately 20 yards east of where C.D.'s body had been found, close to the intersection of Diamond Creek Road. C.D.'s body was on a gurney in the ambulance. A pool of blood remained where C.D.'s body had been found.

9.      I observed, among other things, a series of distinct shoe prints in the dirt area between Hualapai Drive, where C.D. was found, and the parking lot in front of the Multi Building. The dirt had been kicked up in some areas, consistent with the pressure or movement made by feet during a physical altercation. I photographed the bottom of the

3

shoes of each of the officers who had responded to the scene prior to my arrival. I also photographed the bottom of C.D.'s shoes. At least three of the shoe print impressions at the scene differed from the responding officers' and C.D.'s shoe sole patterns.

10. The street was illuminated with public street lighting. Several nearby buildings had operable security cameras installed, including the Multi Building located at 470 Hualapai Drive, the Hualapai Education and Training Building located at 460 Hualapai Drive, the Hualapai Daycare located at 450 Hualapai Drive, and the Hualapai Tribe HeadStart Building located at 440 Hualapai Drive. I requested video surveillance from the available security cameras.

11. FBI SA Kemper Mills arrived on scene at approximately 6:20am to assist. He and I processed the scene, and collected items of evidentiary interest, including a broken hula hoe, a square-nosed shovel, a round-nosed shovel, a bottle with what appeared to be blood splattered on it, and other items. We also began to make casts of shoe impressions.

12. One shoe print impression had a distinct circle in the center of the sole (Print 1). Another shoe impression was a traditional hiking or work boot pattern (Print 2). A third shoe print had a diamond waffle pattern (Print 3). All three of the shoe prints differed from what was worn by the responding officers, medical personnel, and C.D.





**Video Surveillance**

13. Starting at approximately 7:45am, investigators began reviewing available video surveillance. It showed C.D., four assailants, and their general direction of travel before and after the assault.

14. Before the assault, at approximately 12:07am, C.D. was observed traveling east, and being followed by four assailants on foot. Two of the assailants followed C.D. eastbound on Hualapai Drive, while the other two assailants traveled north through the

5

parking area between Hualapai Tribe HeadStart and Hualapai Daycare. The four assailants came together on Hualapai Drive and continued to follow C.D.

15. At approximately 12:08am, C.D. backed into the driveway of 467 Hualapai Drive, which is an abandoned home across the street from the Multi Building. C.D. initially appeared to be carrying two shovels. Then, he threw one shovel into the driveway of 467 Hualapai Drive as he was approached by Assailant 1, who was carrying a hula hoe. C.D. moved toward the front door of the residence.

16. The assailant third in distance from C.D., Assailant 3, ran in front of the other two assailants and attacked C.D. first. C.D. exited the front gate of the fence surrounding the residence, went into the street, and was overtaken by all four assailants. The assailants took C.D. to the ground behind a white Chevrolet Suburban that was backed into a parking space in front of the Multi Building. The video surveillance captured at least one of the assailants repeatedly pumping an arm and/or fist into C.D.'s torso.

17. By approximately 12:09am, all four assailants stood over C.D.'s body, and then started to walk away. The assailants traveled west together on Hualapai Drive, back in the direction from which they had come. The assailants turned south and went down a dirt path between Hualapai Daycare and Hualapai Education and Training. The hula hoe carried by Assailant 1 was found broken in half near C.D.'s body.

18. Assailant 1 was wearing a dark hooded sweatshirt and tan pants.

19. Assailant 2 was wearing a black, long-sleeved shirt and dark pants. The shirt had a light-colored rectangular graphic that covered most of front of the shirt. Assailant 2 had a distinctive hair style with closely cropped hair on the sides, and longer hair on top, braided and pulled back into a ponytail that protruded away from the back of the head.

20. Assailant 3 was wearing a dark, long-sleeved shirt, black shorts, and black high-top shoes or boots.

21. Assailant 4 was wearing a dark hooded sweatshirt with light blue jeans.

**Investigators Followed The Shoe Impressions**

22.     SA Mills observed tracks of Print 1 in a trail in the same direction the assailants traveled after the assault. SA Mills and Sergeant Gunnoe followed footprints matching the description of Print 1 to a fence in the backyard of a residence located at 885 Hualapai Way. Below is an illustration of the approximate path of travel observed by SA Mills and Sergeant Gunnoe of Print 1:



23.     When SA Mills and Sergeant Gunnoe came to the back of the residence, Sergeant Gunnoe observed a male wearing a shirt with a graphic on the front that closely resembled the shirt worn by Assailant 2 in surveillance video. The male had hair that closely resembled the hair style observed on Assailant 2 in the surveillance video.

7

24. Sergeant Gunnoe called for marked units to respond to the residence and approached the side carport door where the male matching the description of Assailant 2 had gone. A male matching the description of Assailant 4 exited that same door. Sergeant Gunnoe ordered that male to have everyone exit the residence.

25. A short time later, three males exited the residence matching the description of Assailant 1, Assailant 2, and Assailant 4. The males were frisked and identified as WYATT JOSEPH SAMSON, LOREN DEAN BRAVO JR., and E JAE DALTON BENDER, respectively. WYATT told Sergeant Gunnoe that DARREN SAMSON was still inside. DARREN exited the residence a short time later.

26. At approximately 8:54am, Manuel Bravo, the owner of the residence, arrived on scene. Manuel provided consent to search the residence. One of the bedrooms was DARREN's room. DARREN was asked for, and provided, consent to search his bedroom.

27. A knife and cellphone were seized from E JAE's person. E JAE had black shoes on, and the pattern on the soles of his shoes closely resembled Print 1.

**E Jae Bender's Shoe Sole**



28. A cellphone was seized from WYATT's person. WYATT was not wearing shoes but had what appeared to be blood stains on the right pant leg of his pants.

**Wyatt's Right Pant Leg**



29.     A black folding knife was seized from LOREN's person.  LOREN had black shoes with a white sole.  The pattern on the soles of his shoes closely resembled Print 3.

**Loren's Shoe Sole**



30.     DARREN exited the residence wearing a black, long-sleeved shirt and long black shorts.  DARREN was not wearing shoes and had black calf socks on.

9

31. The males were provided *Miranda* warnings and subsequently interviewed.

**Loren Dean Bravo, Jr. Interview**

32. At the time of his interview, LOREN DEAN BRAVO, JR. had what appeared to be blood on his left forearm and on the knuckles of his right hand. LOREN said that he is right-handed. When asked to explain the blood on his hands and forearm, LOREN said he got angry at himself the night before and hit a wall with his fist. He was not able to remember what wall he hit. He said he went out the previous night to get a pint of liquor on his own and went up near the Multi Building to meet someone to get the pint. He said that he did not know the name of who he received the pint from.

Loren's Left Forearm



Loren's Right Hand



33. LOREN said that, after getting the pint, he walked to his girlfriend's home on Diamond Creek Road. When asked where his girlfriend lived, LOREN pointed to the home located at 376 Diamond Creek Road. The door was locked on his girlfriend's home, so LOREN said that he came to 885 Hualapai Way and was there the rest of the evening, until the time law enforcement came to the home and asked him to come out. LOREN said that he was wearing the same clothing the prior day and evening. LOREN did not have an explanation as to why someone was seen on surveillance video at the time and place of C.D.'s assault who matched LOREN's description. LOREN said that he did not know C.D. and had no quarrel with C.D. LOREN provided consent for swabs to be taken of the blood on his arm and knuckles, and for a DNA sample.

**E Jae Dalton Bender Interview**

34. E JAE DALTON BENDER said that he had been with his cousin, WYATT, the prior evening, playing Pokémon Go. When asked to explain why someone matching his description, wearing the same clothing at the time of the interview, was seen on video in front of the Multi Building, E JAE said that he and WYATT had gone up to the Multi Building to capture a Cyberjaya, or similar, for the Pokémon Go game around the time he may have been seen on camera. E JAE said that they went to that area to get the Cyberjaya at approximately 11:30pm. E JAE said that he and WYATT came back to 885 Hualapai Way and spent the remainder of the evening with LOREN and DARREN, into the early morning up until the time law enforcement came to the home. E JAE said that he did not know C.D. E JAE provided consent for a DNA sample.

**Darren Samson Interview**

35. DARREN SAMSON said that he had been sleeping all night at Spiderman's home. DARREN explained that Spiderman is his uncle, Manuel Bravo, who is related to LOREN. DARREN said that he, Manuel, E JAE, and WYATT had all been at his aunt's home in Valentine, Arizona, the day before. They all drove home in Manuel's truck. DARREN and the others had purportedly just come back from a three day/night trip shed hunting. They were hunting for antlers shed by deer or elk and had planned to cash their

findings in for money. When they got back from Valentine the prior evening, they unpacked their gear from Manuel's truck. It was getting dark out, and DARREN said that it turned dark approximately 30 minutes after they arrived home. DARREN said that he played video games for two hours and went to bed. He got up to go to the bathroom at approximately 11:00pm and fell back asleep. He woke up once to look at his phone at approximately 3:00am.

36. When asked about someone closely resembling him being seen on surveillance video assaulting C.D., DARREN claimed he did not know C.D. and that it was the first time he had ever heard C.D.'s name. DARREN did say, however, that he had participated in an assault on a male earlier that morning in front of the Multi Building. DARREN said that the male had walked into his uncle's house drunk late the night before. DARREN, WYATT, E JAE, and LOREN had all chased the male out of their house. They chased the male, and DARREN threw the male to the ground. The male hit WYATT in the face with a shovel during the physical altercation. DARREN got at least two or three punches in on the male. DARREN claimed that he was not aware that anyone had been stabbed, or that anyone had died because of the assault. DARREN provided consent for a DNA sample.

**Wyatt Joseph Samson Interview**

37. At first, WYATT denied involvement in a physical assault. His left eye was visibly bruised at the time of the interview, and when asked how he got the black eye, WYATT claimed that he was playing horseshoes at his aunt's home, and someone hit him in the eye with a horseshoe. WYATT claimed that he was playing Pokémon Go the evening before, and that would have explained why he may have been seen on surveillance video in front of the Multi Building. WYATT said that he had gone to the area in front of the Multi Building for approximately ten minutes, with E JAE, as part of collecting a PokéStop. After that, WYATT and E JAE came back to Manuel's home and hung out with LOREN and DARREN the rest of the night. They drank whisky, tequila, and beer.

38. When confronted with the information DARREN provided (i.e., that a male hit WYATT in the face during a physical altercation that morning), WYATT said that he, LOREN, E JAE, and DARREN had all assaulted a man who had come into WYATT's grandmother's house. WYATT said that he did not know the man, but the man had walked into the home where WYATT was staying and disrespected the house. LOREN got in the man's face and told him to leave. WYATT and the others chased the man out of the house. LOREN and DARREN chased the man west on Hualapai Way, to the intersection of Hualapai Drive. LOREN and DARREN followed the man up Hualapai Drive, toward the Multi Building. WYATT and E JAE cut through the field and the parking area between Hualapai Tribe HeadStart and Hualapai Daycare to meet up with LOREN and DARREN.

39. The man had grabbed a shovel from a nearby home and struck WYATT across the face with the shovel during the physical altercation. When asked what WYATT, LOREN, E JAE, and DARREN were talking about when they were walking away from the altercation, WYATT said that they were talking about how they got him. WYATT thought they had just "fucked him up" but thought that he was alright. WYATT claimed that he did not stab the man with anything, and did not know that anyone had stabbed the man, or that anyone had died from the assault.

40. WYATT, LOREN, DARREN, and E JAE were all arrested on tribal charges following their interviews.

41. Investigators searched the residence at 885 Hualapai Way, and found several knives, cellphones, shoes, and a pair of black work boots with a sole pattern that closely resembled Print 2.

**Sole of Black Work Boots**



42.     The boots closely resembled the footwear of Assailant 3, believed to have been DARREN SAMSON, and the right boot was covered in a dark red substance that appeared to be blood.

**Right Black Work Boot with What Appeared to be Blood**



43.   E JAE DALTON BENDER, WYATT JOSEPH SAMSON, and C.D. are all enrolled members of the Hualapai Indian Tribe. LOREN DEAN BRAVO, JR. is not an enrolled member of the Hualapai Indian Tribe, but is believed to be a Hopi Indian. DARREN SAMSON is not an enrolled member of the Hualapai Indian Tribe, but is believed to be a Hualapai Indian because he is not only related to WYATT (who is enrolled Hualapai), but DARREN also appears to live on the Hualapai Indian Reservation, has Hualapai tribal criminal history, and is recognized by local police and community members as being Hualapai.

**Loren, Darren, and Wyatt Were Planning to Make "Bad Choices" on April 20, 2025**

44.   On April 22, 2025, J.G., a full-time missionary, blind carbon copied my personal email address on an email to his family and friends. J.G. is serving the Peach Springs area, among others, and was previously assigned to the area where I live. As such, I had become acquainted with J.G. before his work in Peach Springs, and J.G. knows that I am an FBI agent who works on several Indian reservations, including Hualapai.

45.   J.G. sent the email to his family and friends as part of a weekly update on his mission. J.G.'s email stated, in part, that "On Sunday night we had 3 drunk dudes come to the church where we live and asked for us to pray with them so they could get their minds off some bad choices. We'll [sic] a few hours later they murdered a dude in a parking lot and they got arrested the next morning. Absolutely crazy."

46.   I interviewed J.G. and his assigned companion, T.E., also a missionary. They said that on Sunday, April 20, 2025, they were at the church building on Diamond Creek Road in Peach Springs. A local church member, C.F., brought them dinner at approximately 8:40pm. C.F. was with her 13-year-old daughter, Jane Doe.

47.   J.G. and T.E. met C.F. and Jane Doe outside, in front of the church building. While talking with C.F. and Jane Doe, three males walked in front of the church building, headed north on Diamond Creek Road. All three males walked over to J.G., T.E., C.F.,

15

and Jane Doe, and asked J.G. and T.E. to pray for them. The males were all very drunk, and J.G. and T.E. had a difficult time deciphering everything they were saying.

48. T.E. had been serving in Peach Springs since November 2024, and knew the three males as LOREN BRAVO, DARREN SAMSON, and WYATT SAMSON. LOREN, DARREN, and WYATT said that they wanted J.G. and T.E. to pray that they got home safely. They said they were scared, and people were throwing rocks at them. They wanted J.G. and T.E. to pray for them because they had their minds on some bad choices they were thinking of making. They did not elaborate on what bad choices they were considering.

49. J.G. and T.E. said a prayer outside, in front of the church building, while C.F., Jane Doe, and the three males were all together. The three males left, and continued north on Diamond Creek Road.

50. J.G. and T.E. described LOREN as wearing a shirt with a large graphic of two women on it. LOREN had short-cropped hair on the sides, and a braided ponytail. WYATT had longer hair than the others, past his shoulders. DARREN had shorter hair and was wearing glasses.

51. J.G. and T.E. did not know the name E JAE BENDER, and no one else was with LOREN, DARREN, and WYATT when they were walking on Diamond Creek Road. J.G. and T.E. knew of C.D., and that he had just been released from prison before returning to Peach Springs. When asked how it was that J.G. learned of the murder and subsequent arrest of LOREN, DARREN, and WYATT, J.G. said that they had learned the news from M.B., who works for Hualapai PD, and had been around when the FBI had been in Peach Springs investigating the matter.

## CONCLUSION

52. Based on the above, I respectfully submit that there is probable cause to believe that WYATT JOSEPH SAMSON, LOREN DEAN BRAVO, JR., DARREN SAMSON, and E JAE DALTON BENDER committed the following offenses: (1) Conspiracy to Commit CIR-Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. §§ 371, 1153, and 113(a)(6); (2) CIR-Second Degree Murder, and Aid and Abet,

in violation of 18 U.S.C. §§ 1153, 1111, and 2; (3) CIR-Assault with a Dangerous Weapon, and Aid and Abet, in violation of 18 U.S.C. §§ 1153, 113(a)(3), and 2; and (4) CIR-Assault Resulting in Serious Bodily Injury, and Aid and Abet, in violation of 18 U.S.C. §§ 1153, 113(a)(6), and 2.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of May, 2025, in Lake Havasu City, Arizona.

CAMERON B. MIZELL
FBI Special Agent

Sworn telephonically this 9th day of May, 2025.

Camille D. Bibles
Digitally signed by Camille D. Bibles
Date: 2025.05.09 12:10:49 -07'00'

HONORABLE CAMILLE D. BIBLES
United States Magistrate Judge